LUNDY *et al. v.* GREENVILLE BANK & TRUST Co. *et al.*

(Division A. May 31, 1937. Suggestion of Error Overruled July 19, 1937.)

[174 So. 802. No. 32504.]

284

A. M. Pepper, of Lexington, Arthur Bruce and H. C. Mounger, both of Greenwood, for appellant, J. I. Lundy.

**G. H. McMorrough,** of Lexington, for appellant, Holmes County Bank & Trust Company.

292

H. Talbot Od'om and **Braxton B. Provine, Jr.**, both of Greenwood, for appellees, Greenville Bank & Trust Co., Bank of Commerce, and H. B. Crosby.

294

**Bradford & Lamb**, of Greenwood, for appellee, G. R. McSpadden.

**R. C. McBee**, of Greenwood, for appellee, Greenwood Compress & Storage Company.

**B. B. Allen**, of Indianola, for appellee, The Federal Compress & Warehouse Company.

**Knox Lamb** and **A. H. Bell**, both of Greenwood, for appellees, W. B. Humphrey and J. H. Lear.

**Osborn & Lott**, of Greenwood, for appellees, The Bank of Greenwood and Hardy Robinson.

Argued orally by **Arthur Bruce, H. C. Mounger** and **A. M. Pepper**, for appellant, and by **B. B. Provine, H. T. Odom** and **Hardy Lott**, for appellees.

**Cook, J.**, delivered the opinion of the court.

On May 20, 1935, the Greenville Bank & Trust Company filed a bill of complaint against J. T. McCain and William M. McCain, a partnership trading as J. T. McCain & Son; H. B. Crosby; the Bank of Commerce; the Bank of Greenwood; the Holmes County Bank & Trust Company; J. I. Lundy; W. G. Humphrey, and J. H. Lear.

The bill of complaint alleged, in substance, that the Greenville Bank & Trust Company loaned to the defendants J. T. McCain & Son the sum of $2,681.30, evidenced by their promissory note, indorsed by the defendant H. B. Crosby, and secured by negotiable warehouse receipts for 50 bales of cotton, issued in the name of J. I. Lundy, or bearer; that said receipts were afterwards surrendered by complainant to J. T. McCain & Son under a trust agreement, so that said cotton could be sold and the proceeds paid to complainant on its indebtedness secured by the lien on said cotton; that McCain & Son sold said cotton to the defendant W. G. Humphrey, who in turn sold it to J. H. Lear, and that said warehouse receipts had been surrendered; that in violation of said trust agreement McCain & Son failed to deliver the proceeds of the sale of said cotton to complainant, but had caused the defendant Bank of Commerce to deliver its cashier's check for the sum of $4,416.90, representing the proceeds of such sale, to the

defendant J. I. Lundy, who in turn delivered said check to the defendant Holmes County Bank & Trust Company; that neither Lundy nor the Holmes County Bank & Trust Company were entitled to said check or the proceeds thereof, for the reason that Lundy had clothed McCain & Son with indicia of ownership of said cotton by intrusting the said McCain & Son with the negotable receipts representing said cotton. It was further averred that complainant had acquired said warehouse receipts for value, without notice of any infirmity in the title; that the complainant was entitled to the proceeds of the sale of said cotton to the amount of McCain & Son's indebtedness to it, as evidenced by their promissory note; and that McCain & Son were insolvent. The prayer of the bill was that the Bank of Commerce be enjoined from paying its said cashier's check; that the Bank of Greenwood and the Holmes County Bank & Trust Company be enjoined from presenting said check to the Bank of Commerce for collection; and that on final hearing the Bank of Commerce be directed to pay to complainant the amount of McCain & Son's indebtedness to it, from the funds in the hands of the Bank of Commerce representing the proceeds of the sale of the said 50 bales of cotton. The bill also prayed for a discovery as to the Holmes County Bank & Trust Company, with answer under oath not waived, but by amendment of the bill, before any answers or pleadings were filed, answer under oath was waived.

The writs of injunction were issued as prayed for, and thereafter the several defendants, except McCain & Son, filed answers. The defendant Lundy filed an answer categorically denying all the averments of the bill of complaint. In its answer the Holmes County Bank & Trust Company adopted a large part of the denials of Lundy's answer, and asserted that it held a lien on the 50 bales of cotton as security for a loan of $8000 made on May 13, 1935, by virtue of a pledge of the warehouse receipts therefor, which Lundy promised to deliver to

it but did not deliver, for the assigned reason that he was unable to secure them from McCain & Son. This bank also asserted that it was the owner and holder of the aforesaid cashier's check for value, without notice of any defect in the title thereto, and further stated: "This defendant says that it is not able to collect said cashier's check; it was promptly presented to said Bank of Commerce for payment by it but the said Bank of Commerce refused; said cashier's check was then returned to said J. I. Lundy as uncollected. Said cashier's check had been delivered to this defendant for collection, and credit upon an indebtedness of said J. I. Lundy to this defendant when collected."

The Bank of Commerce filed its separate answer and bill of interpleader, stating the facts in reference to the issuance of the cashier's check, and disclaiming any interest in the conflicting claims as to the ownership of the proceeds thereof, and averring its willingness and readiness to pay the funds represented by the said check to the party legally entitled thereto, and with its bill of interpleader paid into court the amount of the check, and prayed to be discharged from further liability on account of the transaction.

The defendant Humphrey answered and admitted the purchase of 36 of the said 50 bales of cotton, and asserted that the defendant Lundy was a cotton producer, and that for a number of years he had intrusted his negotiable warehouse receipts to McCain & Son as cotton factors to handle, sell, and dispose of cotton represented, owned, or acquired by him, and that during a period of time covering a number of years the said McCain & Son had sold Lundy's cotton to buyers in the Greenwood market; that the warehouse receipts covering the cotton here involved were delivered by Lundy to McCain & Son for the purpose of sale, and that he (Humphrey) purchased said cotton in good faith for a valuable consideration, and without knowledge of any defect in the title or secret limitation on the right of McCain & Son

to sell said cotton, and that he had sold the cotton to the defendant J. H. Lear and had no further possession or control of any of said cotton. J. H. Lear filed an answer asserting that he bought 36 bales of the cotton here involved from W. G. Humphrey, who in turn had puchased it from McCain & Son. He averred that he purchased the cotton in due course of business for a valuable consideration, and without any knowledge of any adverse claim thereto or defect in the title, and that the cotton was released to him from the compress upon the order of J. I. Lundy and William McCain, and that he had sold and delivered the cotton in due course of business without any knowledge of any adverse claim thereto.

On May 21, 1935, the day after the above-mentioned bill of complaint was filed, J. I. Lundy filed a suit in the same court against J. T. McCain and William McCain, doing business as J. T. McCain & Son; Hardy Robinson; the Greenville Bank & Trust Company; the Bank of Greenwood; the Bank of Commerce; the Yazoo & Mississippi Valley Railroad Company, and two compress and warehouse companies. This bill sets forth in detail Lundy's asserted right to the cotton involved in the suit above mentioned, and also to 103 other bales of cotton. It was therein averred that the complainant Lundy had delivered the warehouse receipts covering all the 153 bales of cotton to McCain & Son for safekeeping, with instructions to place them in their fireproof safe until complainant called for them; that William McCain stole or embezzled the said receipts, and in some manner unknown to complainant and without his authority, knowledge, or consent had transferred them to the defendant Hardy Robinson; that the said Hardy Robinson had, in some manner, put the Bank of Greenwood into possession of them; and that the cotton represented thereby had been sold, or was about to be sold and shipped out of the state by some of the party defendants. In this bill it was prayed that all the defendants

be restrained and enjoined from shipping the cotton, and transferring the receipts, and that all the defendants be required to come into court and propound their claims to said cotton and said receipts; and that on final hearing the said injunction be made perpetual, and that complainant be granted a decree against the Bank of Commerce for the payment of the aforesaid cashier's check.

To this bill the Greenville Bank & Trust Company filed a separate answer, and made its answer a crossbill in which it averred its claim and title to the proceeds of the sale of 50 bales of the cotton in substantially the same manner set forth in its bill in the first above-mentioned suit. It averred that the negotiable warehouse receipts covering this 50 bales of cotton were delivered to it by McCain & Son as security for a loan; that at the time said loan was negotiated and the said 50 negotiable receipts were accepted by it as collateral, the said McCain & Son were clothed with full indicia of ownership thereof and apparent authority to deal with the same as their own; that McCain & Son represented to the said Greenville Bank & Trust Company and to H. B. Crosby that they had purchased the cotton represented by the receipts, and, as a consequence, the said Greenville Bank & Trust Company was a holder in due course for value without notice, and prayed that the court declare its lien paramount and superior to the claim of the complainant and cross-defendant Lundy.

The Bank of Commerce filed its separate answer setting out the facts as to the issuance of its cashier's check, and asserting its readiness and willingness to pay the check to the party legally entitled thereto.

The Bank of Greenwood filed its answer and made its answer a cross-bill, in which it alleged that it was the owner for value, without notice, of 99 of the negotiable warehouse receipts described in the bill of complaint and the cotton represented thereby, claiming to have acquired the same as security for a loan made by said bank to Hardy Robinson, who had purchased the cotton

represented by said receipts from McCain & Son for value, without notice of any infirmity in the title thereto, and without any information as to any claim of the complainant to said cotton. This answer and cross-bill was afterwards amended so as to aver ownership and title to 2 additional bales of cotton which it was alleged had been sold by McCain & Son to Carothers & Co., and by the latter company pledged to the said Bank of Greenwood as security for a loan, all without any notice whatever on the part of Carothers & Co. and the bank of any defects or infirmities in the title or right of McCain & Son.

Hardy Robinson filed an answer adopting the averments of the answer of the Bank of Greenwood, and the remaining corporate defendants filed answers, but these answers are not material to an understanding of the issues presented and will not be further referred to.

Upon motion, the Holmes County Bank & Trust Company was permitted to intervene in the latter suit, and in its intervention petition it asserted that it held an equitable lien on all of the 153 bales of cotton by virtue of the promise of Lundy to deliver to it the warehouse receipts for this cotton as security for a loan of $8000, which it had made to Lundy on May 3, 1935, but which receipts the said Lundy had failed to deliver for the asserted reason that he was unable to secure possession thereof.

Other pleadings and answers to cross-bills, are, in substance, mere repetitions of the respective claims of the parties. After the pleadings in this cause were completed, the Bank of Greenwood filed a motion to dissolve the preliminary injunction restraining it from transferring, negotiating, or disposing of 82 bales of said cotton, and on the hearing of this motion it was sustained, and the matter of the allowance of attorneys' fees was reserved until the final hearing of the cause.

Thereafter the Greenville Bank & Trust Company, the Bank of Greenwood, and the Bank of Commerce filed

a motion to consolidate the two above-mentioned causes, and, over the objections of the appellants herein, this motion was sustained, and upon the final hearing of the consolidated causes the court entered a decree sustaining the bill of interpleader filed by the Bank of Commerce and dismissing that bank from further liability; awarding the Greenville Bank & Trust Company a personal decree against John T. McCain, William M. McCain, and H. B. Crosby for the amount of its claim for $3,111.64, and also awarding it a recovery of that amount out of the sum paid into court, being the proceeds of the aforesaid cashier's check, and also awarding to the Bank of Greenwood the sum of $1,189.78 out of the money paid into court, being the net proceeds of 17 bales of cotton which was included in the said cashier's check of $4,416.90, and further adjudging that the Bank of Greenwood was the holder and owner in due course, and for value, of 84 bales of the cotton in question. This decree further adjudged that G. R. McSpadden was the lawful owner of 2 bales of said cotton, which he had purchased from McCain & Son in due course for value, and without notice of any infirmity in the title thereto. It was further adjudged that neither the Holmes County Bank & Trust Company nor J. I. Lundy were entitled to any relief prayed for in either their bills of complaint or cross-bills, except as to John T. McCain and William M. McCain against whom Lundy was awarded a personal decree for $10,093.11. The decree further dismissed all bills and cross-bills as to W. G. Humphrey, J. H. Lear, and the two compress and storage companies and awarded attorneys' fees in favor of the Bank of Greenwood for the wrongful issuance of the injunction against it. From this decree, J. I. Lundy and the Holmes County Bank & Trust Company prosecuted this appeal.

A somewhat lengthy statement of the facts appears to be necessary in order to make clear the many issues presented, and the asserted rights of the numerous parties. The appellant J. I. Lundy has been engaged for

many years in growing cotton on his plantation in Leflore and Holmes counties, while during a large part of that time J. T. McCain & Son, a partnership composed of John T. McCain and his son, William McCain, have been engaged in the cotton business, as factors, in the city of Greenwood, Miss., and until the facts developed in this record came to the attention of the public, each member of this firm enjoyed an excellent personal and financial reputation, and the senior member of the firm still enjoys such reputation. For a number of years prior to 1934, McCain & Son acted as agents or factors for the appellant in selling a great deal of the cotton grown by him, although he testified that they had not acted as his exclusive agents, and that he had required that they submit to him for approval all offers to purchase his cotton before consummating sales thereof. During these years, as shown by the testimony of a number of witnesses who were engaged in the cotton business in Greenwood, and as admitted by Lundy, cotton buyers on that market, including appellees Hardy Robinson and W. G. Humphrey, had purchased Lundy's cotton from McCain & Son, paying them for the cotton, and receiving from them the negotiable warehouse receipts representing it. It was further testified by these buyers that in purchasing Lundy's cotton through McCain & Son they pursued the same course of action as was pursued in purchasing cotton from all factors, and that they never received any protest of any kind with reference to the manner in which these sales were handled.

In the year 1934, Mr. Lundy raised 203 bales of cotton, which were ginned and stored in the warehouses of the Federal Compress & Warehouse Company and the Greenwood Compress & Storage Company, appellees herein, and these warehouse companies issued their uniform negotiable warehouse receipts therefor, payable to J. I. Lundy or bearer. As to the subsequent handling of these receipts until they came into the hands of Mc-

Cain & Son, we have only the testimony of Mr. Lundy. He testified that he kept these receipts at his home until the last of February, when he carried them to the office of McCain & Son and instructed William McCain to take the receipts and make a list of the cotton and get samples thereof, and that on March 2d, he went to the office of these factors and was then furnished a list of the cotton, and was informed by William McCain that the samples were ready, and that he then requested William McCain to permit him to keep the receipts in McCain & Son's iron safe for safe-keeping ''because it was a long distance to my place and I wanted to keep them here convenient in case of sale to have them convenient and I had no safe at home and in case of fire they might be destroyed and I asked him to let me keep them in his safe and he told me, I will put them right here for you when you want them.'' In further explanation of his handling of these receipts at that time, in response to a question, Lundy replied: ''Well, I had shipped the cotton from Sidon to the compress and the compress sent me receipts. I kept the receipts at home until along about the 2d of March I believe it was. I told Mr. McCain I would like to sell it, that cotton was going up and would like for him to get samples and turned the receipts over to him and asked him to make a list of it and get samples and he said all right, that he would, and he did that and said what you want done with the receipts and I says I have no safe and would like to leave them in your safe for safe-keeping until I get ready to sell it and he said all right it will be ready whenever you want it and I left the receipts there until I got ready to sell it.''

After the events above detailed, the samples of this cotton remained on display on McCain & Son's tables, and on or about March 10, 1935, they reported to Mr. Lundy an offer from Dumas & Co., of Memphis to purchase 50 bales of this cotton, and, upon approval of this offer by Mr. Lundy, this sale was consummated by Wil-

liam McCain by delivering to Dumas & Co. the receipts, and accounting to Lundy for the net proceeds of the sale. Appellee Hardy Robinson testified, and Mr. Lundy admitted, that about that time he (Lundy) requested Robinson to look at some cotton which he had on McCain & Son's table, and which he wanted to sell. Robinson testified that thereafter, during the month of March, he purchased several lots of this cotton, all aggregating 99 bales. Mr. Lundy testified that after a controversy arose in reference to this cotton and the receipts therefor, William McCain claimed, in the presence of Robinson, that he had not sold the cotton to Robinson, but had merely pledged the receipts as security for a loan from Robinson, but that Robinson denied that there was any loan involved. A brother-in-law of McCain's was also permitted to testify that McCain told him he had merely borrowed money from Robinson on these receipts. Whether there was an outright sale of these 99 bales of cotton or a mere pledge of the receipts, which would appear to be immaterial, the receipts were disposed of by McCain without the knowledge or consent of Lundy, and the indorsement of Lundy's name on some of these receipts was forged.

The Bank of Greenwood financed many cotton buyers, including Hardy Robinson, under a standard form of contract which allowed the purchaser of cotton to give his checks for cotton purchased. drawn on said bank, which were honored and carried by the bank in the form of an overdraft. Upon each check given by the buyer there was required to be marked the number of bales for which the check was given in payment, and on the same day on which the check was honored by the bank, the buyer was required to deposit with the bank the warehouse receipts for the cotton so purchased, as security for the overdraft and any indebtedness owing the bank by the cotton buyer. The undisputed evidence is to the effect that the appellee Robinson deposited and pledged the warehouse receipts for the above-mentioned

99 bales of cotton with the Bank of Greenwood to secure his overdraft in that bank, without notice on the part of the bank or Robinson of any defect or infirmity in the title and right of McCain & Son thereto. During the progress of this cause in the court below, the answer and cross-bill of the Bank of Greenwood was amended so as to assert title to 2 additional bales of cotton alleged to have been acquired by it from Carothers & Co. under a similar arrangement and contract as outlined above, and there is evidence to the effect that the warehouse receipts for these 2 bales were acquired by the bank as security for the repayment of checks drawn by Carothers & Co. in favor of McCain & Son for the purchase price of these 2 bales of cotton. G. R. McSpadden was also permitted to intervene and assert title to 2 bales of the Lundy cotton by virtue of the purchase thereof from McCain & Son in due course of business, for value, without notice of any defect or infirmity in the title to the warehouse receipts therefor.

In reference to the remaining 50 of the 153 bales, there is involved a wholly different and disconnected series of facts and transactions which will be here stated. On March 27, 1935, William McCain applied to H. B. Crosby, a cotton factor of Greenville, Miss., for a loan to be secured by 50 negotiable warehouse receipts, payable to J. I. Lundy, or bearer, which McCain represented to Crosby he had purchased. By means of pledging these receipts as security for his promissory note, which was indorsed by Crosby, $2,306.50 was borrowed by McCain from the Bank of Leland on April 29, 1935. McCain applied to Crosby for a further loan on the 50 receipts to take up his note to the Bank of Leland and to cover some additional items. Crosby arranged to secure this loan from the Greenville Bank & Trust Company, but since the president of that bank did not know McCain, Crosby was required to indorse the note given therefor. Thereupon the note of McCain & Son for $2,681.30, being 11½ cents per pound for the 50 bales,

was executed, payable 60 days after date, to H. B. Crosby, and secured by the 50 warehouse receipts, and this note was discounted by the Greenville Bank & Trust Company, and the amount thereof paid to William McCain. Crosby testified that it was understood and agreed between him and William McCain that if Crosby's line of credit required the payment of the note at any time before maturity thereof, McCain would pay the note to the bank; that later he notified McCain to pay the note, and thereupon, on May 16, 1935, McCain came to Greenville and told him he had a sale for the cotton, and upon its consummation he would pay the note, and then offered to give his check therefor on the release of the warehouse receipts. The Greenville Bank & Trust Company declined to release the receipts on McCain & Son's check, but upon representations of McCain that the sale of the cotton would be consummated and the money paid that day, the bank released the receipts to Crosby on a trust receipt or agreement, for the purpose of permitting them to be sent by special messenger to Greenwood to be surrendered to McCain upon the payment to this messenger of the amount of said note. The receipts were then delivered to the special messenger with instructions to carry them to Greenwood and surrender them to McCain upon receipt of New York Exchange for the amount of the note. Later in the day this messenger informed Crosby by telephone from Greenwood that the proposed buyer was out of the city, and the sale could not be consummated that day. This messenger was then instructed to deliver the 50 receipts to Holmes and Provine, cotton factors in Greenwood, with instructions to deliver them to McCain upon the receipt of the amount of the indebtedness to the bank.

On the following day, upon request of William McCain, these receipts were delivered to him for the purpose of invoicing the cotton and consummating the proposed sale, but with the understanding and agreement that he would immediately pay to these factors the

amount of the indebtedness to the bank. McCain did not pay this amount to these factors during the day, and upon investigation it was discovered that he had sold to W. G. Humphrey these 50 bales, together with 17 bales of the Lundy cotton, the receipts for which he had on that day secured from the Bank of Greenwood, on a trust receipt authorized by Hardy Robinson; that William McCain had collected from Humphrey the purchase price of these 67 bales by means of a check drawn by Humphrey on the Bank of Commerce, and that in turn McCain had delivered to Lundy his check for the net proceeds of the cotton, and that for this check Lundy had received from the Bank of Commerce a cashier's check for the sum of $4,416.90, payable to himself, and that this cashier's check had been at once forwarded to the Holmes County Bank & Trust Company for credit upon Lundy's indebtedness to that bank.

As to this indebtedness to the Holmes County Bank & Trust Company, the evidence shows that on May 3, 1935, Lundy applied for and secured a loan of $8000 from that bank, upon his promise to deliver to it as security negotiable warehouse receipts for 153 bales of cotton then supposed to be in the hands of McCain & Son. Mr. Lundy testified that when he called for these receipts William McCain informed him that he had sent them to Memphis to Dumas & Co. when he sold the first 50 bales of the cotton; that from day to day he failed to produce the receipts, giving various excuses therefor, until on or about May 16th he reported to Lundy that he had an offer for the sale of all the cotton, which he (Lundy) approved; that on the following day Mc-Cain reported that the proposed buyer could use only 67 bales of the cotton, and that the sale of these 67 bales to Humphrey was then consummated by the payment of the proceeds to McCain, who in turn delivered McCain & Son's check to Lundy, with which he purchased from the Bank of Commerce its cashier's check for $4,416.90, as a convenient and acceptable method of passing that

amount on to the Holmes County Bank & Trust Company for credit on his indebtedness to that bank, and that he at once forwarded this check for that purpose. After the payment of this check had been enjoined, William McCain admitted to Lundy that he had been lying to him in reference to his handling of the receipts.

Upon discovery of the facts above stated, the suits here presented, which were afterwards consolidated, were filed, praying for the relief outlined in the foregoing statement of the pleadings.

The solution of most of the issues presented herein depends upon the determination of the legal effect of the acts of the appellant Lundy in intrusting the custody of the 203 negotiable warehouse receipts to McCain & Son, when construed in the light of the applicable provisions of the Uniform Warehouse Receipts Act (Laws 1920, c. 218), being chapter 71, section 3481 et seq., Code 1930. Section 37 of this act, section 3517, Code 1930, provides that negotiable warehouse receipts, payable to bearer, may be negotiated by delivery, the language of this section being, in part, as follows:

"A negotiable receipt may be negotiated by delivery:

"(a) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the bearer, or

"(b) Where, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of a specified person, and such person or a subsequent indorsee of the receipt has indorsed it in blank or to bearer."

It is admitted that all the warehouse receipts involved in this cause were payable to J. I. Lundy or bearer, and that they were negotiable by delivery is at once apparent upon reading the above-quoted section.

Section 40 of the act, being section 3520, Code 1930, provides who may negotiate warehouse receipts, and reads as follows:

"A negotiable receipt may be negotiated:

"(a) By the owner thereof, or,

"(b) By any person to whom the possession or custody of the receipt has been entrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been entrusted, or if at the time of such entrusting the receipt is in such form that it may be negotiated by delivery."

Section 41 of the act, section 3521, Code 1930, specifies the rights which are acquired by a person to whom a receipt has been negotiated, and reads as follows:

"A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value, and

"(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him."

Section 47 of the act, section 3527, Code 1930, provides as follows:

"The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake, or duress to entrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, paid or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, or mistake or duress."

Section 58 of the act, being section 3538, Code 1930, defines various terms of the act, and provides that unless

the context or subject-matter otherwise requires, "to 'purchase' includes to take as mortgagee or as pledgee," and " 'purchaser' includes mortgagee and pledgee," while " 'value' is any consideration sufficient to support a simple contract." It is further therein provided that "a thing is done in 'good faith' within the meaning of this article when it is in fact done honestly, whether it be done negligently or not."

Section 57 of the act, section 3537, Code 1930, provides that the act "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it," and in construing the effect of its provision, in the case of Commercial National Bank v. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 S. Ct. 194, 197, 60 L. Ed. 417, the Supreme Court of the United States said:

"This rule of construction requires that in order to accomplish the beneficient object of unifying, so far as this is possible under our dual system, the commercial law of the country, there should be taken into consideration the fundamental purpose of the uniform act, and that it should not be regarded merely as an off-shoot of local law. . . . We think that the principle of the uniform act should have recognition to the exclusion of any inconsistent doctrine which may have previously obtained in any of the states enacting it."

In Rudy v. Quincy Market Cold Storage & Warehouse Co., 249 Mass. 492, 144 N. E. 286, 287, in reference to the proper interpretation of the Uniform Warehouse Act, it was said:

"The language of the act is to be construed with reference to the object to be attained. Its words are to be given their natural and common meaning, and the prevailing principles of statutory interpretation are to be employed. Care should be taken to adhere as closely as possible to the obvious meaning of the act, without resort to that which had theretofore been the law of this commonwealth, unless necessary to dissolve obscurity or

doubt, especially in instances where there was a difference in the law in the different states.''

Also to the same effect, see Federal Compress & Warehouse Co. v. Coleman, 143 Miss. 620, 109 So. 20.

From an analysis of the above-quoted sections, it will be noted that negotiable warehouse receipts, payable to bearer, may be negotiated by mere delivery, by any person to whom the custody of such a receipt has been intrusted by the owner, if at the time of such intrusting the receipt is in such form as it may be negotiated by delivery; and that a person to whom such a receipt is negotiated acquires under it such title to the goods as the person negotiating the receipt to him and the depositor of goods or the person to whose order they were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value.

It is clear from the evidence in this record that for many years McCain & Son had acted as factors for Mr. Lundy in the sale of at least a part of his cotton; that the buyers in the market had been accustomed to buy Mr. Lundy's cotton from McCain & Son and pay them therefor; and that Lundy had perfect confidence in the honesty and integrity of the members of this firm. While Mr. Lundy testified that he delivered the warehouse receipts to McCain & Son for safe-keeping, it is also clear from his testimony that he did so in preparation for and in contemplation of a sale by them of the cotton. In addition to the fact that he desired fire protection, he testified that he left the receipts with McCain & Son ''because it was a long distance to my place and I wanted to keep them here convenient in case of sale to have them convenient.'' Shortly after he left the receipts with McCain & Son, he had notice of the fact that these factors were exercising control over the receipts, for the reason that he was charged with notice that they were forwarding 50 of these receipts to Memphis for the purpose of consummating, with his approval, a sale of 50 bales of the cotton. Under Lundy's di-

rections, William McCain had used the receipts for the purpose of securing samples of the cotton placed upon their factor's tables, with the view of negotiating sales of the cotton. Mr. Lundy had requested a buyer to examine his samples on McCain & Son's tables with the view of purchasing the cotton, and after such examination this buyer acquired the receipts for value, without notice. Under these facts and circumstances, we think it must be held that Lundy intrusted the possession and custody of these bearer receipts to McCain & Son, within the meaning of the above-quoted section 3520, Code 1930; and at the time they were so intrusted they were in such form that they could be negotiated by McCain & Son by delivery.

With this basic holding as to the fact of the possession and custody of the receipts in mind, it is necessary to follow the subsequent course of McCain & Son's dealings with the receipts to determine the respective rights of the numerous claimants, and, in doing so, we will first dispose of the asserted rights to the 101 receipts which passed to the Bank of Greenwood.

The evidence shows that the cotton represented by 99 of these receipts was either sold to Hardy Robinson, or these receipts were pledged to him as security for a loan, and if, in view of section 3538, Code 1930, defining "purchaser" as used in the Uniform Warehouse Act, it is material whether there was a sale or pledge, we must assume that the chancellor found that there was a sale, since he held the transfer of these negotiable receipts to Robinson for value to be a valid negotiation of the receipts. The receipts were subsequently pledged by Robinson to the Bank of Greenwood; and that both Robinson and the Bank of Greenwood paid value for the receipts and neither of them had any notice of any defect or infirmity in the title thereto, or of any limitations upon the right of McCain & Son to negotiate them, is shown by the uncontradicted evidence. This being true, by the pledging of these receipts to it, the Bank of

Greenwood acquired a lien which was superior to any rights of Lundy, who had surrendered the possession and custody of the receipts under such circumstances as to clothe the holder with indicia of ownership and enable him to negotiate them to a bona fide purchaser for value. And in view of section 3527, Code 1930, this same result follows, although the negotiation of these receipts by McCain & Son was fraudulent, or a breach of duty on their part, this section providing that the validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, even where the owner is induced by fraud, mistake, or duress to intrust the possession and custody of the receipt to such person, provided the person to whom the receipt was negotiated or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, fraud, mistake, or duress. This is also true as to the 2 bales which were sold by McCain & Son to Carothers & Co., the receipts for which were subsequently negotiated to the Bank of Greenwood for value, without notice on the part of either Carothers & Co. or the bank.

The 67 receipts, the proceeds of which finally passed into the form of a cashier's check, payable to Lundy, consisted of 17 of the 99 receipts mentioned above, which had been acquired by the Bank of Greenwood from Robinson, and the 50 receipts which had been pledged by William McCain to the Greenville Bank & Trust Company.

After these receipts were intrusted to the possession and custody of McCain & Son, William McCain, through and with the assistance of H. B. Crosby, as indorser, pledged 50 of the receipts to the Greenville Bank & Trust Company, and this bank afterwards, through its agents, surrendered these receipts to William McCain, in trust,

for the purpose of consummating a sale of the cotton represented thereby, and the application of the proceeds thereof to the payment of McCain & Son's indebtedness to it. And by permitting the pledgors to withdraw these receipts and regain possession and control thereof under an agreement to sell them for the pledgee's account, the pledgee did not lose its rights, and the superiority of its lien over the rights of the owner, who had originally intrusted the possession and control to the pledgors, was not impaired; and unless the surrender of the receipts by the pledgee resulted in the subsequent negotiation of them to a purchaser in good faith for value, the lien of the pledgee was not affected thereby. Commercial National Bank v. Canal-Louisiana Bank & Trust Co., supra. When McCain & Son regained the possession of these receipts from the pledgee, Greenville Bank & Trust Company, for the purposes stated, they had the power to again negotiate them to a purchaser in good faith for value, and upon the sale of the cotton and transfer of the receipts to W. G. Humphrey, a purchaser in good faith for value, this purchaser acquired absolute title thereto as against both Lundy and the Greenville Bank & Trust Company. And, it is contended by the appellant Lundy that when this cotton was sold to Humphrey, and McCain & Son's check for the net proceeds of this sale was delivered to him and passed into a cashier's check issued by the Bank of Commerce, Lundy's rights as the owner of the cotton were restored. This would undoubtedly be true if, after the surrender of the receipts by the Greenville Bank & Trust Company, Lundy had, without notice of the pledge, given value for the proceeds of the cotton, but at the time of this sale to Humphrey, Lundy's rights in the cotton had been lost or were subordinate to the rights of the pledgee, and his position was in no way improved by reason of the surrender of the receipts by the pledgee, in the absence of a negotiation to him in good faith for value. And this record does not show that he parted with anything of value within

the meaning of the warehouse act. Prior to the sale of these 67 bales of cotton to Humphrey, Mr. Lundy had given notice to the warehouse company where the cotton was stored, not to release or ship it except on his order, and upon the sale of the 67 bales, he authorized the warehouse company to release this cotton, and it is suggested that the release of the cotton at a time when he had no notice of the rights of the pledgee constituted such consideration or value as would make him a purchaser for value. After the loss of his rights in the cotton to a subsequent pledgee, his stop order to the warehouse company was wholly ineffective and valueless as against such pledgee, and the warehouse company could have been required to surrender the cotton to the pledgee or other purchaser in good faith for value. In authorizing the release of the cotton, Lundy gave up nothing of value, and while this would follow as a necessary sequence after Lundy had lost his title and right to the cotton, either by a sale thereof or a pledge of the receipts to a purchaser for value without notice, it is made certain by virtue of the provision of section 3521, Code 1930, providing that a person to whom a negotiable receipt has been duly negotiated, acquires thereby ''(b) the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him.''

In the briefs of counsel for appellant, there is extensive argument and citation of authority to establish the already well-recognized doctrine that ''a cashier's check is merely a bill of exchange, drawn by a bank upon itself, and accepted by the act of issuance,'' Anderson v. Bank of Tupelo, 135 Miss. 351, 100 So. 179, and that such a check is not subject to countermand by the issuing bank. The fact that as against the payee the issuing bank may have no right to refuse payment of its cashier's check, does not prohibit a third party, who is interested in the proceeds of the check, from intercepting the

payment thereof by injunctive process of the courts. In the case of Bank of Clarksdale v. Planters' National Bank, 156 Miss. 269, 125 So. 837, a cashier's check issued by the Bank of Clarksdale was assigned by the payee to the Planters' National Bank for value, but before presentation thereof the Bank of Clarksdale was enjoined from paying the check, and when it was afterwards sued on this check in a court of law it set up as a defense to the suit the injunctive proceedings. And it was held that the cashier's check amounted to a contract to pay on demand, and that instead of relying on the injunction as a defense to the suit at law on the check, the Bank of Clarksdale should have paid the money into court and impleaded the parties, just as was done by the Bank of Commerce in this cause.

When the Greenville Bank & Trust Company surrendered the possession of the pledged receipts to McCain for the sole purpose of having the cotton sold for the benefit of the pledgee and for the application of the proceeds to the secured debt, McCain became trustee for the bank, and in disposing of the cotton he was acting as trustee, but the effect of the further argument for appellant Lundy is that when, in violation of the trust, the proceeds of the trust property were passed into the form of a cashier's check, payable to a third party, the bank lost its rights to follow the cotton or the proceeds thereof. The well-recognized rule that when a trustee has invested the trust property or its proceeds in any other property into which it can be distinctly traced, the cestui que trust may follow it into the new investment, unless the interest of a bona fide purchaser for value has intervened, is broad enough to authorize the pledgee of the receipts to follow the proceeds of this cotton into the cashier's check, since the payment thereof was intercepted by injunctive process based upon an asserted right to such proceeds. The exact net proceeds of these 50 bales of cotton, as well as the 17 bales released by the Bank of Greenwood upon a similar trust receipt, were

distinctly and with absolute certainty traced into the said cashier's check, and may in each case be subjected to the payment of the secured debt.

The facts in reference to the Holmes County Bank & Trust Company's claim to the cashier's check have been hereinbefore fully stated. The claim of this bank cannot be maintained under either of the two theories presented by its pleadings. In its answer to the original bill filed by the Greenville. Bank & Trust Company, it alleged that the said check was delivered to it for collection and credit when collected on an indebtedness of Lundy to it; that it was unable to collect the check upon presentation;. and that it then returned the check to Lundy as an uncollected item. It is clear from these ;averments that this bank did not become a purchaser for value of this check, but, on the contrary, it accepted it for collection and credit, and all its rights therein were surrendered when it returned the check to Lundy as an uncollected item. In its petition to intervene in the suit filed by J. I. Lundy, this bank asserted an equitable lien on the cotton and proceeds thereof by reason of the promise of Lundy to deliver the receipts to it as security for a loan. Conceding that as between Lundy and the bank there was, by virtue of Lundy's promise to deliver the receipts, created an equitable lien in favor of the bank, this lien cannot prevail against a prior pledgee or purchaser of the receipts for value without notice. At the time Lundy promised to deliver these receipts to the bank he did not have the possession or custody thereof, and his right to negotiate them had been lost, since a valid negotiation thereof by one to whom the custody and possession had been intrusted had already been consummated; and consequently the bank did not acquire a lien which was superior to the rights of the party to whom the receipts had been duly negotiated.

In addition to the assignments of error discussed above, there are many assignments based upon procedural matters, and upon the admission and exclusion of evidence, upon which appellants seek a reversal of this cause.

It is contended that the court erred in consolidating the two causes. The court found that the consolidation of the causes would save labor and costs, prevent delay, and would not prejudice the rights of any of the parties to either cause. In so far as the principal and controlling issues were concerned, the two suits were between substantially the same parties, and the respective rights of the parties, and the facts upon which they were based, were so closely interwoven that we think consolidation was proper, and that the court did not abuse its discretion in so doing.

Appellants also assign as error the allowance of an amendment of the bill of complaint filed by the Greenville Bank & Trust Company intended to clarify the record in reference to a switch or exchange of 13 of the receipts pledged to the Greenville Bank & Trust Company for 13 receipts pledged to the Bank of Greenwood. This exchange appears to have been made at the time of the consummation of the sale to Humphrey, and the receipts involved in the exchange were of equal value. The rights of Lundy were in no wise affected by this exchange of the receipts, or by the amendment to the bill of complaint.

The appellants have many assignments of error based upon the admission and exclusion of evidence. A large part of these assignments are based upon the admission of evidence under reserved rulings, upon which there was no formal request for a ruling; but aside from that fact, we have examined the many assignments and have reached the conclusion that none of them present error prejudicial to the appellants, or of sufficient materiality to warrant or justify a reversal of the cause.

Appellants also assign as error the allowance of attorneys' fees to the Bank of Greenwood upon dissolution

of the injunction restraining it from selling or disposing of 82 of the warehouse receipts, which it acquired from Hardy Robinson. This injunction was dissolved at a hearing in vacation, but the matter of the allowance of damages was reserved until the final hearing of the cause. It appears to us that this injunction was a mere incident to the relief sought in appellants' original bill, the purpose of the injunction being merely to retain the status quo until the final determination of the asserted rights of the respective parties to the title and ownership of the 82 receipts and the cotton represented thereby. These issues were not and could not well be finally determined until the final hearing of the cause. The suit was not one for injunction alone, but the primary purpose thereof was to establish title to, and recover from the bank, these warehouse receipts. And the mere fact that there was a separate hearing on a motion to dissolve the ancillary injunction, when it was necessary that the cause proceed to a full and final hearing upon the merits to determine the issues involved and the rights of the parties, did not of itself authorize the allowance of attorneys' fees as damages, and upon the record in this cause we think the allowance should not have been made. Jamison v. Dulaney, 74 Miss. 890, 21 So. 972; Curphy v. Terrell, 89 Miss. 624, 42 So. 235; Mims v. Swindle, 124 Miss. 686, 87 So. 151; Staple Cotton Co-operative Ass'n v. Borodofsky, 139 Miss. 368, 104 So. 91.

The decree of the court below will therefore be modified to the extent of eliminating therefrom the allowance of attorneys' fees, but in all other respects it will be affirmed.

Affirmed as modified.