TENNESSEE JOINT STOCK LAND BANK *v.* BANK OF GREENWOOD *et al.*

(Division A. Feb. 8, 1937. Suggestion of Error Overruled Nov. 22, 1937.)

[172 So. 323. No. 32503.]

J. J. Breland, R. L. Cannon, and L. Q. Strong, all of Sumner, and Gardner, Denman & Everett, of Greenwood, for appellant.

536

Bradford & Lamb, of Greenwood, for appellee, W. G. Humphrey.

James **O**. **Eastland**, of Ruleville, for appellee, C. H. Aldridge.

540

**H. T. Odom, B. B. Provine, Jr.,** and **Osborn & Lott,** all of Greenwood, for appellees, The Bank of Greenwood, Commodity Credit Corporation, and Reconstruction Finance Corporation.

Argued orally by **J. J. Breland**, and **Richard Denman**, for appellant, and by **H. T. Odom**, and **Hardy Lott**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

On November 1, 1934, the appellant, Tennessee Joint Stock Land Bank, exhibited its original, and subsequently its amended and supplemental bills of complaint against E. P. Fryer, C. O. Fryer, W. V. Woods, Itta Bena Compress Company, Bank of Greenwood, and W. G. Humphrey, all residents of Leflore county, Miss.; the Commodity Credit Corporation and Reconstruction Finance Corporation, non-residents, and C. H. Aldridge, a resident of Montgomery county, Miss. The bill alleged that the Tennessee Joint Stock Land Bank, hereinafter called the land bank, as assignee of the Mississippi Joint Stock Land Bank, rented about 400 acres of land to the defendants E. P. and C. O. Fryer for a cash rental of $2400, evidenced by a written rent contract. This farm, hereinafter called the Coleman Place, was the only place owned or operated by the land bank in LeFlore county, and 1934 was the first year in which it operated same. That the land bank was the landlord of the Fryers, and that they were indebted on account of the rent for that year to the land bank in the sum of $1300.95. It alleged that two lots of cotton had been sold by the tenants to the various defendants without authority, and sought to subject the cotton so sold to the payment of said rent, and a decree for the amount thereof against the purchasers of the cotton and the conversion of the same for the balance of the rent.

At the return term, a decree pro confesso was rendered against the Fryers and W. V. Woods, who failed to answer, for the balance of the rent, which decree became final, and they have not appealed.

The only relief sought against the Itta Bena Compress Company was a temporary injunction enjoining it from

disposing of the cotton stored in its warehouse, and no personal decree was sought against it.

All the other defendants filed answers denying the material allegations of the bill, and setting up the defenses that the land bank, as landlord, had permitted its said tenants to store the cotton in controversy in the said Itta Bena Compress and take, in the name of one of said tenants, C. O. Fryer, negotiable warehouse receipts therefor, and had permitted and authorized the tenants to dispose of the cotton, and further that the land bank had expressly waived its landlord's lien, and further, by its act and conduct in dealing with said cotton, had impliedly waived its lien thereon.

On the trial of the case the court finally dismissed the bill, and the land bank appeals from that decree.

The two lots of cotton—one of 29 bales and the other of 5 bales—were raised by the Fryers on the Coleman Place, stored in the Itta Bena Compress prior to October 15, 1934, and standard negotiable warehouse receipts were issued for the 29 bales by number and weight in the name of E. P. Fryer, or bearer, and the several receipts for this lot of cotton, which we shall hereinafter designate as the Fryer cotton, were ultimately hypothecated to the Greenwood Bank for a government loan on October 2, 1934. The 5-bale lot was stored in the warehouse and negotiable warehouse receipts issued in the name of W. V. Woods, who afterwards sold this cotton to either Humphrey or Aldridge, and applied the proceeds of the sale to the payment of his indebtedness to Aldridge who had furnished him supplies to make the crop in 1934. Woods was a subtenant of the Fryers and was to pay one-fourth of the cotton as rent.

The lease contract executed by the land bank to the Fryers was dated January 13, 1934, and contained this stipulation: "The party of the first part (the land bank) further agrees to waive its statutory rent lien in favor of what is commonly known as a furnisher's mortgage, made for the purpose of furnishing funds for the

making of the 1934 crops, however, this waiver is to be upon the following expressed conditions: (1) The waiver in no case shall exceed $1200.00 on the cultivated land, and shall be only for such amount as it actually furnished.''

About February 21, 1934, E. P. Fryer obtained a loan amounting to $1,265 from the Greenwood Production Credit Association, secured by deed of trust on the crops raised on the Coleman Place, and the land bank executed its waiver in pursuance of the above stipulation in the lease contract. During the year the land bank executed further waivers in the total sum of $175.

Stating the facts now as applied to the Fryer cotton— 29 bales—the land bank had employed three agents as its representatives in Mississippi. R. L. Stockett and Trull were two of such agents. Stockett's main duties were to effect sales of land, the land bank having 57 separate plantations in the Mississippi Delta, and sometimes to effect rentals, and he negotiated the lease between the Fryers and the land bank. He had no authority to effectuate a contract, but he recommended this contract which was approved by the land bank. In the spring of 1934, he was directed by the land bank to make certain improvements on the Coleman Place, and was on the place frequently. According to the record, he made his last visit to the place about August 15. The Fryers testified to certain statements and waivers made by Stockett, which statements were rejected by the chancellor, in his finding of fact, as not being contractual. Stockett testified that on the other places it was the custom of the bank to have the cotton stored in warehouses in the name of the land bank and of the particular tenant; that on occasions tenants had stored the cotton in their own names, and on some few occasions he had collected cash from a few tenants on account of rent due the land bank. He further testified that he had no authority to execute a waiver, or to give consent to the tenants to dispose of the cotton.

Trull was an agent of the land bank, and his duties carried him to these various plantations in the Mississippi Delta looking after the crops. He testified that his duties were limited, in that he was to collect the rents from the tenants, and to see that the tenants accounted for the crop productions on the various places. About August 15, he began inspection of the Coleman Place, went there for the purpose of overseeing the planting of vetch on the lands rented to the government. About that time, the Fryers had begun picking their cotton, and the record shows that it was rapidly harvested and ginned at Itta Bena, and then sent by trucks to the Itta Bena Compress Company, receipts issued in the name of E. P. Fryer, and receipts for the 29 bales issued to Fryer or bearer, and delivered to the Greenwood Production Credit Association. All of this lot of cotton had been stored in the compress warehouse before October 1st. Trull was of the opinion that during the first two weeks he was planting the vetch there was very little cotton picked. He testified that he had no other authority other than that detailed.

On October 2, 1934, C. O. Fryer executed a sworn application for what is commonly called the government 12-cent cotton loan on this Fryer lot of cotton, for a loan of $1,838.04, stating therein that there were no liens. This application was received by the Bank of Greenwood, the loan made on Fryer's note for that amount due some time later, secured by the compress receipts for this cotton. The evidence shows that this cotton was worth, at the time, $2,160.70. Fryer discharged the balance of his debt for "furnish" to the Greenwood Production Credit Association, paying them $990.11 from this 12-cent cotton loan. He also paid therefrom to the land bank on his rent $261.08. The balance of the proceeds of this loan is not accounted for, and was evidently appropriated by Fryer to his own purposes.

Fryer testified that while he was operating a tractor for Trull, engaged in planting the vetch, he told Trull

that he was going to get a 12-cent loan on his cotton from a government agency. This conversation was, at first, denied by Trull, but he finally admitted that some such conversation might have occurred, and that he might have said to Fryer, in response, that the land bank was selling its cotton, however, he did not agree that Fryer might dispose of the cotton by securing a loan, neither did he prohibit it, nor was any other action taken by the land bank. Trull declares that he did not know where the cotton from this plantation was ginned, nor that it was stored in a warehouse, and did not know that there was a warehouse in Itta Bena. He testified that he was often unable to see Fryer when he visited the place, and that the inquiries he made did not elicit the whereabouts of the cotton until he sent another employee, Smith, after October 18, 1934, to investigate as to the products of the place, and received a report from Smith to the effect that this lot of cotton had been stored with the compress warehouse, and that he so reported to the land bank about October 24, 1934, in response to this letter to him from the president of the land bank:

"October 18, 1934.

"Mr. E. S. Trull, Marks, Miss.

"Dear Mr. Trull:—In Re #28, Coleman Place.

"I have your letter in regard to the rents of the Coleman Place and am getting just as nervous as I can be about these rents. Cant you or one of your men go down there and if necessary spend a couple of days to get this rent. Perhaps I ought not to be nervous, but I just cant help it. Wont you please do this, as I think it is really essential. Why dont you write them on receipt of this letter, telling them you will be down there Monday to get the money. If it takes two days to collect this, it will be time well spent. I am including the note in this letter so there will be no excuse for them not paying you, and even if the note is not due, it should be paid because they have the cotton on hand to do it."

Stockett also denied that he had any knowledge of

the fact that the cotton was being stored in the name of Fryer in a warehouse.

The managing officers and agents of the land bank testified that only Thompson, vice president, and Moore, president of this corporation, had authority to permit the Fryers to store the cotton in a warehouse, or take negotiable receipts therefor.

Trull testified that he went with Fryer to the county agent to secure what are called "Bankhead Cotton Tags" which appear to be necessary in order to gin cotton, and that he, for the land bank, applied therefor, making C. O. Fryer trustee, and delivered them to Fryer. Afterwards, the land bank bought some of the tags from Fryer to be used in other counties, and credited the Fryer brothers therewith at 2½ cents per pound. Fryer testified that Trull agreed to pay him 4 cents per pound, and that Trull knew he was ginning the cotton and storing it in the warehouse. When or how does not appear.

The Greenwood Bank, which advanced the money to Fryer on the 12-cent cotton loan, transferred and assigned the note and cotton warehouse receipts hypothecated as security for the note to a Memphis Bank, and they were successively assigned to the Commodity Credit Corporation, and, at the time of the trial, appeared to have been in the possession of the Reconstruction Finance Corporation. The custom was to use local banks as agents for the Commodity Credit Corporation, which, at that time, was making cotton loans, at 12 cents per pound, to cotton owners. If there is liability on the part of the Greenwood Bank, and others, for the conversion of this cotton, the amount that would be due thereon would be $907.62, with 6 per cent. interest per annum from October 2, 1934.

As to the 5 bales of Woods' cotton, it is contended by him that, in the light of the agreement in the lease contract as to the alleged waiver by the landlord tenant in the above statement of facts, he and Aldridge are not

liable, because he was a subtenant of the Fryers, and the limitation in the contract as to the waiver by the landlord to the extent only of $1200 that had been increased to, at least, $1375, without the knowledge and consent of Woods, released Woods, the subtenant, as surety for Fryer; further, that the agricultural products, consisting of cottonseed from the 45 bales of cotton, raised on the place, and other products, had been appropriated by the Fryers without any effort on the part of the land bank to assert its lien thereon. The record does show that Fryer retained two tons of cottonseed valued at $100 and sold it months after this litigation was initiated.

On these facts, in a written opinion, the chancellor held that the agents of the land bank, Trull and Stockett, were constantly in touch with the farming operations throughout the year 1934, and had full knowledge of the way in which crops were grown and handled. He further found that no agreement was ever made between the land bank and the Fryers as to how the crops should be handled, and correctly held that no agreement had been claimed. He held, however, that, from this evidence the complainant knew that the cotton was being picked, ginned, and stored in a warehouse and that negotiable warehouse receipts were being issued thereon, and that it never, at any time, demanded same, but, on the contrary, permitted this to be done, and trusted the Fryers to account to it for the rent. He also held that the doctrine of equitable estoppel applied, and that the maxim of "Equity aids the Vigilant," obtained in this case, and, further, that where two innocent parties must suffer by reason of the wrongful act of a third person, the loss should fall upon the party whose negligence made the wrongful act possible. He held that all the purchasers of the cotton were bona fide purchasers for value without notice, and granted a decree against Aldridge for $96.11, the value of one-fourth of the Woods' cotton unquestionably due by him to the Fryers as rent;

against the Fryers for the balance of the rent, and stated that whatever equity the Fryers had in the 29 bales of cotton then in the hands of the Reconstruction Finance Corporation should be applied to the rent, after payment of the loan and interest originally made by the Greenwood Bank.

We think the court below erred in its conclusion of law as to the Fryers' 29 bales of cotton. The record demonstrates that there was never any personal communication or correspondence between the Fryers and the managing officers of the land bank; no kind of communication between the pledgee of the cotton, the Greenwood Bank, or any of its assignees, relative to this cotton, and no affirmative consent on the part of any of the officers or agents of the bank, either a farm agent or a managing officer, that Fryer could store his cotton and take warehouse receipts therefor in the name of the tenant, or to bearer.

We think it is without dispute that no officer or agent of the land bank had any knowledge of the warehouse receipts until long after October 2, 1934, when these warehouse receipts were pledged by the Fryers to the Greenwood Bank, which took them as security for a loan without any notice of any infirmity therein.

No custom had been established by the landlord in the case at bar with the tenant, for the reason that only in the year 1934 had such relation existed. At the time the warehouse receipts were pledged to the Greenwood Bank, the rent was not due.

The fact that Trull, the farm agent of the land bank, obtained the "Bankhead Cotton Tags" in order that the tenant might gin his cotton does not point to any agreement to make disposition of the cotton. The evidence as to the 12-cent cotton loan was in no sense a permission to Fryer to store his cotton, or to pledge same, in his own name. On the contrary, Trull, the agent, told Fryer that the bank was selling its cotton.

Fryer knew that, so far as he was concerned, the land-

lord had a lien on his cotton for the unpaid rent. He did not seek permission to sell or pledge it.

It is a violent assumption and unwarranted by the record that Trull knew, or had reason to believe or suspect, that Fryer intended to violate the law and pledge his cotton without his landlord's consent.

All these facts did not tend to show that the landlord, Trull, or Stockett expected the tenant to sell or pledge his cotton and pay the rent from the proceeds of such sale or pledge.

From an analysis of these facts, we think the conclusion is inescapable that the landlord, in this case, did not waive his lien, and did not tacitly consent to the disposition of the products, and the letter quoted, supra, in our opinion, is a clear declaration, on the part of the landlord, to look to the cotton for the payment of the rent.

Section 2186, Code 1930, establishes a paramount lien on agricultural products in favor of the landlord to secure payment of the rent, and the removal of such products from the leased premises does not interfere with the landlord's right to enforce such lien. Fitzgerald v. Fowlkes, 60 Miss. 270, and Henry v. Davis, 60 Miss. 212, 213.

Any person, with or without notice, who purchases such agricultural products on which a lien exists in favor of the landlord is liable to the landlord for the value thereof. Warren v. Jones, 70 Miss. 202, 14 So. 25; Schmitt et al. v. Federal Compress & Warehouse Co. et al., 169 Miss. 589, 153 So. 815.

In order to constitute a waiver of a landlord's lien, the evidence must preponderate that the landlord either affirmatively agreed, or, by his conduct and course of dealing, permitted a tenant to deal with the agricultural products as though they had been freed from his lien. This court said in McGee v. Carver, 141 Miss. 463, 106 So. 760, 761, that "Having trusted Norwood [the tenant] with the indicia of ownership, he is precluded by

the statute from asserting a lien thereon against one who purchased the warehouse receipt in good faith for value. Commercial National Bank of New Orleans v. Canal Bank, 239 U. S. 520, 36 S. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25.''

Under the Uniform Warehouse Receipts Act, section 3521, Code 1930, subdivision (a), a purchaser without notice for value of warehouse receipts does not acquire title when he purchases from a mere trespasser. Marine Bank & Trust Co. v. Greenville Sav. Bank & Trust Co., 133 Miss. 91, 97 So. 526; Schmitt v. Federal Compress & Warehouse Co., supra.

In the case of Commercial Nat. Bank of New Orleans v. Canal Bank, supra, the Supreme Court of the United States said that a pledgee of bills of lading for cotton who permits the pledgors to withdraw same under an agreement to hold for the pledgee's account, and thus enable the pledgors to obtain negotiable warehouse receipts which they pledge to a bank as security for their notes, cannot question the title of the bank, having clothed the pledgors with the indicia of ownership within the meaning of the doctrine established by the uniform warehouse receipts act.

The gravamen of the decision of the court below in the case at bar is based upon the fact, as argued by the various appellees, that, in his opinion, before the rent was due, the landlord was under the duty to act as a detective in his dealings with his tenant and suspect him of dishonesty, when no fact or circumstance, implying such, has been brought to the attention of the principal, the land bank, or any of its subordinate agents. Prior to October 18, 1934, there is nothing in this record to indicate that the land bank, or the agent, Trull, had any cause to suspect dishonesty on the part of its tenants, nor is there any language which can be attributed to them, indicating that the landlord expected the tenants to sell the cotton and pay the landlord the money.

What we have said is based on the assumption that

whatever notice came to the agent, Trull, bound his principal, the land bank, and that it was within the scope of his authority. We assume this, but do not so decide same from this record, as it is unnecessary for the court to so decide. Of course, Trull was not a general agent but was one of limited authority, and if such notice as attributable to him was beyond the scope of his authority, it did not bind the principal.

We conclude that the record does not warrant the finding that the landlord, in the case at bar, clothed the tenant by its permission with the indicia of apparent ownership.

All the facts in this case do not warrant the assumption by this court that there was negligence on the part of the landlord, or authorize it to apply the maxim, "Equity aids the Vigilant."

Assuming that Trull knew that the tenant was picking, ginning, and storing his cotton in a warehouse, the proof wholly fails to show that Trull had reason to suspect that the tenant was taking negotiable warehouse receipts therefor payable to Fryer or bearer.

Without this statement of Fryer that Trull knew he was storing the cotton in a warehouse, the court could not have reached its conclusion. The chancellor repudiated Fryer's evidence upon material points, but accepted this statement.

Did this knowledge, without action on the part of the land bank, clothe Fryer with indicia of ownership, or estop it? We say not, and the answer is found in the language of Chief Justice Hughes, in the case of Commercial National Bank of New Orleans v. Canal Bank, supra, which is as follows:

"It is a familiar rule that one who has no title to chattels cannot transfer title unless he has the owner's authority or the owner is estopped. See Civil Code (La.), arts. 2452, 3142, 3145, 3146. It follows that, in the absence of circumstances creating an estoppel, one without title cannot transfer it by the simple device of ware-

housing the goods and indorsing the receipts. But if the owner of the goods has permitted another to be clothed with the apparent ownership through the possession of warehouse receipts, negotiable in form, there is abundant ground for protecting a bona fide purchaser for value to whom the receipts have been negotiated. Pollard v. Reardon, 65 F. 848, 852, 13 C. C. A. 171, 21 U. S. App. 639; Williston, Sales, Section 421.''

Warehousing cotton is, in this day, good husbandry. Fryer had the receipts issued in his own name and excluded the landlord without the latter's knowledge and consent. Under the facts of this record, Fryer was not clothed by the landlord with indicia of ownership—therefore no recognized principle of estoppel can be applied here, and the fact that the landlord did not promptly discover the trespass upon his rights by his tenant cannot be said to be negligence which would, on any principle of estoppel, relieve the appellees from liability for their conversion of the cotton. As to the Fryers' 29 bales of cotton, a decree will be entered against the appellees who took over this cotton on the pledge for $907.62 with 6 per cent. interest per annum from October 2, 1934.

As to the Woods' 5 bales of cotton, a decree was entered in favor of Aldridge and Woods on the theory we have declined to adopt. It follows that the chancellor has not passed on the facts at issue in this behalf. We have therefore decided to reverse and remand the case as to the Woods cotton.

Reversed and judgment here for appellant in part; reversed and remanded in part.