LINEBURGER BROS., et al. v. HODGE, et al.

Division B. Oct. 8, 1951.

No. 37945 (54 So. (2d) 268)

**Henry & Barbour** and **Herman B. DeCell**, for appellants, the growers.

211

Forrest G. Cooper and Edward M. Lowrance, for appellee, the Warehouse Company.

**Neil, Clark & Townsend,** for appellees and cross-appellants, the receipt buyers.

**Alexander, J.**

Separate bills were filed against the Federal Compress & Warehouse Company, a corporation, by E. S. Vancleve, J. R. Hodge, and E. A. Bates & Company, a partnership, each praying for a mandatory injunction against the defendant to compel delivery of cotton held by the defendant to them as purchasers and holders of the warehouse receipts covering the number of bales of cotton held respectively by each of the complainants, or in the alternative for the value of the cotton thereby represented. The total number of bales is twenty-four, Vancleve claiming nine, Hodge six, and E. A. Bates & Company nine.

It is adequately shown that all of the cotton was grown and ginned by Lineburger Brothers, B. C. Lineburger, J. G. Outlaw and F. A. Little, and stolen by one J. V. Carr from a gin where the cotton had been processed and tagged. This asportation occurred at night and was conducted with the aid of a truck driver who was not a regular employee of Carr. Early the next morning Carr carried the cotton to the defendant warehouse, and, after weighing, had the receipts issued in three fictitious names and delivered to him. Carr took the receipts to nearby towns and sold the cotton, so identified, to the three complainants in separate lots. The purchasers gave their separate checks to Carr who procured payment by endorsing them respectively in the names of the three fictitious persons. He then disappeared and has not since been located.

As stated, the three buyers filed their separate bills against the warehouse. The gin company was not made a party. Upon application of the planters or owners, they were allowed to intervene and claim the cotton. From a decree dismissing the petition of the intervenors, absolving the warehouse of negligence in the issuance of the receipts, and awarding title to the respective warehouse receipts to the purchasers with full rights to claim the cotton thereby represented, after paying storage charges to the warehouse, the planters, or owners, appeal. A cross-appeal is filed by the complainants which urges that in event of a reversal of the decree, they be awarded a decree against the warehouse for the value of the cotton.

We deal first with the cross-appeal. It is grounded chiefly upon the alleged negligence of the warehouse in issuing the receipts to Carr in the names given by him. The superintendent of the warehouse testified that he had been in the business of a compressor and warehouseman of cotton for twenty-eight years, and that this cotton was handled as all cotton had been throughout the years; that the warehouse had and exercised no

control as to who should haul cotton to its warehouse; that the gins were never instructed as to what data should be placed upon the gin tags; that his employees had no instructions or duty to read the gin tags to ascertain actual ownership; that the warehouse knew that Carr was a hauler and no ground for suspicion against him had arisen; and that the customary procedure for warehousing and issuance of receipts did not require an examination into the actual title to each bale so delivered to it, and it was impracticable and not expected that it undertake to adjudge actual title. It was further shown that sometimes cotton was sold after it had been ginned and before it reached the warehouse.

The employees who took in and weighed the cotton and issued receipts testified that Carr had for a period of about two years delivered cotton to the warehouse and taken receipts therefor; that if the names of the owners were on the gin tags they did not know it, and it was customary to do no more than identify each bale by its gin tag number, displayed in large red figures; and that no such device as perpetrated by Carr had ever occurred and there was no reason to suspect any irregularity. The custom and usage in these matters were relevant upon this issue. Smith v. Farmers Ginning Association, 201 Miss. 573, 29 So. (2d) 663.

It was further testified for the warehouse that it had in the past handled over 450,000 bales of cotton, and during the ginning seasons it handled from one thousand to twelve hundred bales a day, and had a capacity of 52,000 bales.

Other witnesses testified that the Lineburger cotton was ordinarily handled in a different manner from other cotton in that it was kept separate in the warehouse and no samples were taken since it was not to be sold but transported by the owners to another state.

The wife of Carr, and others, testified that, while Carr hauled considerable cotton for the Lineburger interests, he had no authority to haul any except upon specific

occasions to be designated by such owners. The warehouse did not know of this arrangement and assumed that Carr was authorized to haul the cotton here involved.

In support of the contentions of the buyers, it was testified that there was sometimes a blank in which the name of the owner could write his name or initials, and in fact the name or initials of the intervenors was written—evidently in pencil—on these gin tags. It is further contended that, although the light was poor at the time the receipts were issued and the employee who took the numbers from the tags had defective vision, the warehouse should have completely identified the cotton as belonging to the owners. Furthermore, although Carr was known to the intervenors, and hauled cotton on other occasions for them, the names he supplied for the receipts were unfamiliar and should have aroused suspicion and suggested inquiry. However, the warehouse received cotton from about forty different gins.

Regardless of the plausibility of the contention of the appellees, there was an issue of fact in the matter of negligence of the warehouse, and we find no basis for overturning the finding of the chancellor, whose acquittance of the warehouse must of necessity have been upon such absence of negligence.

We approach, then, the rights of the appellants, the planters and owners. As heretofore stated, they had given Carr no authority to take and haul away any of this cotton. Specific instructions, including the time and identity of cotton to be so hauled, were always given, and Carr knew this. It is immaterial whether the warehouse knew of this limitation upon Carr's authority. It is sufficient that this limitation was understood between Carr and appellants. ▉▉ Here there was no dispute, and it is without question that the taking by Carr, under all the circumstances, was larceny, and that the receipts were fraudulently obtained. The next morning Carr was seen and made two different and untrue statements as to where the receipts were. One of these reports was

to one of the owners who had discovered that the cotton was missing and was seeking to locate the receipts. There was no one at the gin when the cotton was abstracted, except Carr, his driver, and Mrs. Carr and her small son. The manager of the gin was not present, and he later testified that he had instructions that Carr was not to haul the Lineburger cotton except upon specific instructions. We repeat that the gin is not a party here and the test of the right of the owners must depend on whether this cotton was under any circumstances entrusted to Carr by permission and knowledge of the owners.

We find that the cotton was not so entrusted to Carr, and since the cotton was in fact stolen and the receipts fraudulently obtained, the defense of apparent authority, although available to the warehouse, does not aid the claim of the purchasers of the receipts.

It was held in Unger v. Abbott, 92 Miss. 563, 46 So. 68, that the rule caveat emptor applies against the claim of an innocent purchaser of warehouse receipts who purchased them from the owner's servant who had been sent with cotton to a compress company with instructions to have it weighed and to bring the receipts back to the owner, but who, contrary to his authority and instructions, took the receipts in his own name and sold them.

If it be observed that this case was decided prior to our statutes upon Warehouse Receipts, Chap. 16, Vol. 4, Code 1942, attention is directed to Section 5051, which is as follows: "A negotiable receipt may be negotiated: * * *

"(b) By any person to whom the possession or custody of the receipt has been entrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been entrusted, or if at the time of such entrusting the receipt is in such form that it may be negotiated by delivery."

We look next at Section 5052: "A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value, and * * *."

Section 5058 is also in point. It is as follows: "The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by fraud, mistake, or duress to entrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, paid or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, or mistake or duress."

Appellees cite for support Weil Bros., Inc. v. Keenan, 180 Miss. 697, 178 So. 90. Here there was an interpleader suit filed by the warehouse. The testimony disclosed that the receipts had been entrusted to one Spencer by the owner, and were misappropriated by the former. After recognizing that one, especially a trespasser, can not convey a better title than he has, the Court found that the receipts had been entrusted to the thief and an innocent purchaser was protected. To the same effect is Lundy v. Greenville Bank & Tr. Co., 179 Miss. 282, 174 So. 802, and other cases cited by appellees. See also 56 Am. Jur., Warehouses, Sec. 62.

Our statutes do not go so far as those of some other states in protecting a bona fide purchaser of negotiable receipts in cases where the receipts had been stolen. See 56 Am. Jur., Warehouses, Sec. 53. Since such receipts

were not negotiable at common law, their negotiability is to be measured by our statutes.

We hold, therefore, that neither the cotton nor the receipts had been entrusted to Carr by the owners and that the latter are not estopped to set up their claim to the cotton as against the several appellees who purchased the receipts.

The analogy to those cases where the lien of a landlord is protected against a bona fide purchaser is not without point. See Campbell v. Farmers Bank, 127 Miss. 668, 90 So. 436; Marine Bank, etc. v. Greenville, etc., Bank, 133 Miss. 91, 97 So. 526; Tennessee, etc. Bank v. Bank of Greenwood, 179 Miss. 534, 172 So. 323; Schmitt v. Fed. Compress & Warehouse Co., 169 Miss. 589, 153 So. 815.

The assertion wants no support that the statutes referred to were designed to insure the negotiability of warehouse receipts and to facilitate commerce in the market places where cotton is brought and sold. The innocent purchaser of a negotiable receipt is guaranteed an assurance without which the traffic could not be conducted. Yet, such assurance must take into account the older principle that an owner of cotton may not be divested of title by a trespasser or a thief. In order to strike a just balance between these two concepts the statutes were enacted. The buyer must still beware lest he is buying receipts which have been fraudulently obtained or cotton which has been stolen. We need not analyze the statutes to divine whether the owner, who has voluntarily clothed another with indicia of ownership or entrusted him with possession of receipts, is barred of recovery from an innocent purchaser by principles of estoppel or pursuant to the rule that where two innocent persons must suffer from a fraud, he who reposes confidence in the fraudulent agent must suffer. It is enough that the statute recognizes title in the innocent purchaser who has bought receipts from one to whom they have been entrusted by the owner.

Here, as in all such cases, one of two innocent persons must suffer the loss. The thief has stolen or fraudulently obtained property from someone. We hold that the unlawful act was committed against the owners and that the title to the cotton remains in them. As stated in Unger v. Abbott, supra, "(The appellees) are to be condoled with for their loss by this swindle; but their misfortune can not affect the right of (the appellants) to have (their) cotton. * * * 'Caveat emptor' applies." [92 Miss. 563, 46 So. 68.]

The cause will be reversed and decree awarded to the appellants for the cotton, and the Federal Compress & Warehouse Company is directed to hold the same to the order of appellants, but without storage charges thereon. The cross-appeal is thereby decided adversely.

Reversed and decree here for appellants.