ST. PAUL FIRE AND MARINE INSURANCE CO. *v.* LEFLORE BANK & TRUST CO.

No. 43738 January 17, 1966 181 So. 2d 913

*Brewer, Deaton & Evans,* Greenwood, for appellant.

*Lott & Sanders,* Greenwood, for appellee.

BRADY, TOM P., J.

This is an appeal by the St. Paul Fire and Marine Insurance Company from a judgment rendered by the Circuit Court of Leflore County, Mississippi against it in favor of the appellee, Leflore Bank & Trust Company, in the sum of $15,957.92 and costs of court. The facts in this case are prolific but the disposition of this case does not require a detailed analysis of all the evidence and we confine ourselves solely to those matters which are essential.

The appellee is engaged in the banking business, while the appellant is engaged in the business of insurance. In 1960 appellant sold and issued to appellee a certain insurance policy commonly called a bankers blanket bond, which was dated August 1, 1960. All premiums required for the policy at the time of appellee's loss had been paid and the policy was in full force and effect. The pertinent parts of the policy which are for consideration here are as follows:

The Underwriter agrees to indemnify the Insured to any amount not exceeding $50,000.00 from and against any loss sustained by the Insured through having, in good faith and in the course of business, whether for its own account or for the account of others, in any representative, fiduciary, agency or any other capacity, either gratuitously or otherwise, purchased or otherwise acquired, accepted or received, or sold or delivered, or guaranteed in writing or witnessed any signatures upon, or given any value, extended any credit or assumed any liability, on the faith of, or otherwise acted upon any Securities, documents or other written instruments which prove to have been counterfeited, forged, raised or otherwise altered or lost or stolen . . . .

The record discloses that at the time of the transactions involved, C. E. Holmes was engaged and had been for many years engaged in conducting a cotton business in Greenwood, Mississippi. The appellee was engaged in lending money to Holmes, a cotton buyer, on the security of cotton represented by cotton warehouse receipts. These loans were made under the terms of a written contract between the appellee and Holmes dated November 19, 1962. This contract was the usual contract prevailing in this area under which banks financed men engaged in the cotton business.

Under the contract between appellee and Holmes, the appellee paid checks and drafts drawn on it by Holmes

and accepted from Holmes cotton warehouse receipts as security for the indebtedness created by appellee's having paid such checks and drafts. On May 2, 1963, the indebtedness of Holmes to appellee under the above contract amounted to $22,328.69, plus interest from April 29, 1963, at the rate of 5½% per annum.

The record discloses that this loan had been made by appellee to Holmes in good faith and in the regular course of business under the written contract; that Holmes had placed with appellee a cash margin of $3,300 and 138 negotiable warehouse receipts issued to bearer by cotton warehouses located in Mississippi, to evidence the ownership of cotton on storage in the warehouse issuing the receipt. The appellee discovered that neither Holmes nor it had any title to 122 of these warehouse receipts. As to the remaining 16 receipts of the 138 held by the appellee, appellee had D. T. Sayle & Company, a Greenwood cotton factor, sell these bales for the highest prices obtainable, and applied the proceeds of these sales and Holmes' cash margin of $3,300 to the indebtedness due it by Holmes. After these applications were made to Holmes' debt, appellant claimed Holmes owed a balance of $17,619.46, with interest at the rate of 5½% per annum from July 10, 1963, until paid. Appellee had no security for this indebtedness except the 122 warehouse receipts hereinabove mentioned.

Appellee's immediate demand of Holmes that he pay his indebtedness in full was of no avail and, because of Mr. Holmes' financial circumstances, the appellee could not collect from him any of the balance due. Appellee thereupon made demand for the cotton in the three compresses which had issued the 122 receipts being held by appellee. The three compresses refused to comply with appellee's demand.

Appellee's investigation disclosed that the owners of the cotton evidenced by the 122 receipts had made bond for the receipts to the warehouses in question, obtained

new or duplicate receipts from the warehouses and had secured the cotton from the three compresses and shipped it away, and that the compresses no longer had the cotton. One of the rightful owners of the receipts testified on cross-examination and redirect that he discovered that the man who had taken 20 receipts from his desk was C. E. Holmes and that he caught Holmes in the collar and shook him and told him that he had stolen said property and that the Federal Government was going to get him if he didn't turn the receipts back in, and that as a result Holmes delivered 12 of the 20 receipts to the Itta Bena Compress for cancellation but could not deliver the other 8 receipts because they were in the possession of the appellee.

The procedures or methods utilized in the issuance of new or duplicate cotton receipts, the record discloses, are those which are customarily followed, and are in accordance with the Federal Warehouse Act under which the warehouses operated.

The undisputed evidence in the record establishes the fact that the 122 receipts were lost by or stolen from the rightful owners at various times in 1960, in November 1961, and on February 26, 1962, and that thereafter under the contract of November 19, 1962, between appellee and Holmes, the said receipts were pledged to appellee by Holmes. It is admitted that on June 6, 1963, appellee executed and delivered to appellant proof of its loss on a form furnished to appellee by the appellant for that purpose. Appellant denied any liability to appellee and appellee instituted suit demanding judgment against appellant in the sum of $17,427.66. Appellant filed a demurrer to the declaration. The demurrer was overruled and appellant filed its answer denying any liability. The cause was tried and a peremptory instruction was granted to the appellee and judgment entered in favor of appellee in the sum of $14,692.40. From this judgment this appeal was taken.

There are two assignments of error:

1. The trial court erred in overruling the demurrer of appellant and in directing a verdict for appellee.

2. Appellee cannot recover from appellant for a loss until there is an actual loss and the proof in the case at bar clearly shows that the compresses or cotton warehouses are still liable for their original cotton warehouse receipts.

The demurrer of the appellant assigned six grounds. The essential parts of the two errors assigned by the appellant overlap and are so interrelated that they can be treated together. Moreover, the six grounds urged in appellant's demurrer are likewise argued under the two errors assigned. Therefore, the errors do not have to be discussed separately.

Appellant urges that the whole question involved is: Can the bank as a holder of an insuring bond recover from its bonding company while it holds original negotiable cotton warehouse receipts that were pledged to the bank in the due course of business? The answer to this basic question is determined by the proper answer to subordinate questions necessarily involved therein.

At the outset we hold that the determining provisions of the bond specifically contemplate the coverage of the losses occasioned in the case at bar. In substance the appellant agreed to indemnify the appellee "to any amount not exceeding $50,000.00 from and against any loss sustained by the Insured (Appellee) through having, in good faith and in the course of business . . . extended any credit or assumed any liability, on the faith of, or otherwise acted upon any Securities, documents or other written instruments which prove to have been . . . lost or stolen . . . ."

The record discloses that the appellee extended credit to C. E. Holmes in good faith and in the course of business, in the sum of $14,692.40, which is less than the $50,000 limitation. The proof further conclusively shows

that the warehouse receipts, which C. E. Holmes pledged as collateral for the loans and which the appellee bank acted upon as security for the loans, were stolen.

Turning next to the question of whether or not the appellant can be held responsible to the appellee for appellee's loss, the appellant urges that it is not required under the provisions of the aforementioned section of the bankers blanket bond to reimburse the appellee for the stated loss for the reason that the warehouses did not strictly comply with the requirements of Mississippi Code Annotated section 5025 (1956), which reads as follows:

> Where a negotiable receipt has been lost or destroyed, a court of competent jurisdiction may order the delivery of the goods upon satisfactory proof of such loss or destruction and upon the giving of a bond with sufficient sureties to be approved by the court to protect the warehouseman from any liability or expense, which he or any person injured by such delivery may incur by reason of the original receipt remaining outstanding. The court may also in its discretion order the payment of the warehouseman's reasonable costs and counsel fees. The delivery of the goods under an order of the court as provided in this section, shall not relieve the warehouseman from liability to a person to whom the negotiable receipt has been or shall be negotiated for value without notice of the proceedings or of the delivery of the goods.

 █ Mississippi Code Annotated section 5025 (1956) does not make it mandatory upon a warehouseman to institute suit where an original outstanding receipt has been lost or destroyed. The statute says that a court of competent jurisdiction may order delivery of the goods upon satisfactory proof of such loss or destruction and upon the giving of bond with sufficient sureties to be approved by the court "to protect the warehouseman from any liability or expense, which he or any person

injured by such delivery may incur by reason of the original receipt remaining outstanding." To hold that this language makes it mandatory upon the warehouseman to institute suit in order to obtain a court order is reading into this statute a requirement which is not there.

The proof in this case shows that the warehouseman required the rightful owners of the cotton to give bond in twice the value of the cotton in order to protect the warehouseman and any other rightful claimant because of the issuance of new or duplicate warehouse receipts. A suit in a court of competent jurisdiction would not have protected the warehouseman any more than he was protected in the case at bar and the bond which the warehouseman required likewise protected any other person to whom the negotiable receipt had been negotiated for value without notice of the proceedings or of the delivery of the goods represented by the receipt which had been lost or stolen.

The duty of the warehouses to deliver the goods upon demand is set out in Mississippi Code Annotated section 5019 (1956), as follows:

A warehouseman, in the absence of some lawful excuse provided by this article, is bound to deliver the goods upon demand made either by the holder of a receipt for the goods or by the depositor, if such demand is accompanied with:

(a) An offer to satisfy the warehouseman's lien.

(b) An offer to surrender the receipt if negotiable, with such indorsements as would be necessary for the negotiation of the receipt, and

(c) A readiness and willingness to sign, when the goods are delivered, an acknowledgment that they have been delivered if such signature is requested by the warehouseman.

In case the warehouseman refuses or fails to deliver the goods in compliance with a demand by the holder

or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal.

The appellant urges that the appellee made absolutely no effort to collect from the warehouse even though appellee held the original negotiable cotton warehouse receipts; that the appellee "simply flew to the Bonding Company, demanding payment of a loss that they alleged to have suffered." Appellant urges that there is some duty on the bank to make some efforts to obtain the relief that they are entitled to receive in the courts before resorting to a suit against the bonding company; that otherwise a company that insured a bank under what is commonly known as a bankers blanket bond would be called upon to pay every kind of conceivable loss that the bank imagined they had sustained.

It is conceded by appellant and appellee that no sums can be collected from Holmes, because of his financial condition, nor can the cotton be obtained from the warehouses because the rightful owners have long since obtained it and disposed of it.

Appellant further urges that the provisions of the insuring bond do not provide coverage against errors in business judgment. We expressly hold that the provisions of the policy commonly known as the bankers blanket bond c o v e r the losses sustained here by appellant. The words "bankers blanket bond" are used to indicate a broad and liberal construction which is placed upon the terms and conditions of the insurance policy. The policy expressly designates losses occasioned by the appellant "in good faith and in the course of business" where any credit was extended or liability assumed "on the faith of, or otherwise acted upon any Securities, documents or other written instruments . . . lost or stolen . . . ."

Appellant earnestly urges that Mississippi Code Annotated section 5058 (1956) provides that the validity

of the negotiation of receipts is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation or the fact that the owner of the receipt was induced by fraud, mistake or duress to entrust the possession or custody of such person, if the person to whom the receipt was negotiated or the person to whom the receipt was subsequently negotiated, paid value therefor without notice of the breach of duty or fraud, mistake or duress.

We find no error in appellant's explanation of that section 5058 provides, but the inference does not follow that the appellee here had a right to sue the warehouseman for the cotton represented by the receipts for the reason that the receipts in this case were not released because of fraud, mistake or duress to entrust the possession or custody of the receipts by the rightful owners to Mr. C. E. Holmes. These receipts were stolen and the law of Mississippi has constantly drawn a distinction where the owner of the receipt was induced by fraud, mistake or duress to entrust the possession or custody of the receipt to some person who subsequently negotiated it and where the receipt was stolen by the person who attempted to negotiate the same.

■■ ■ The question of title of the appellee to the receipts that the cotton represented by the same is controlled by the Uniform Warehouse Receipts Act of Mississippi, appearing as Mississippi Code Annotated sections 5012 through 5070 (1956). The Act as originally promulgated and as adopted and still in force in Mississippi does not permit a receipt to be negotiated by anyone except the owner, or a person to whom the owner has entrusted possession of the receipt. It provides that the negotiation of the receipt is not impaired by the fact that the owner of the receipt was induced by fraud, mistake, or duress to entrust the possession of the receipt to another or that its negotiation by the person to whom it was entrusted by the owner was a breach of

duty on the part of such person. ██ ▇ The Act does
not, however, permit a trespasser, a finder or thief to
pass any title to the receipt. To the contrary, it provides
that the person to whom a negotiable receipt is negoti-
ated acquires thereby only "such title to the goods as
the depositor or person to whose order the goods were
to be delivered by the terms of the receipt had or had
ability to convey to a purchaser in good faith for value
. . . ." (Miss. Code Ann. §5052 (1956)).

Section 5052 is verbatim with section 41 of the Uni-
form Warehouse Receipts Act. Subsequently it was pro-
posed that the Uniform Warehouse Receipts Act be
amended by two uniform amendments so as to permit
a trespasser, thief or finder to negotiate a receipt.

Section 5051 apparently is identical with the original
section 40 of the Uniform Warehouse Receipts Act. A
proposed amendment to section 40 has been adopted by
some states and provides as follows:

> A negotiable receipt may be negotiated by any person
> in possession of the same, however such possession
> may have been acquired, if, by the terms of the receipt,
> the warehouseman undertakes to deliver the goods to
> the order of such person or if at the time of negotiation
> the receipt is in such form that it may be negotiated
> by delivery. As amended August, 1922.

Mississippi has not adopted the proposed amendment
of section 40.

Appellant does not deal with the amendment relating
to section 40 nor with Mississippi Code Annotated sec-
tion 5051 (1956), but appellant impliedly urges that sec-
tion 5058 authorizes a recovery by the appellee against
the warehouseman. Section 5058 is the same as section
47 of the Uniform Warehouse Receipts Act. A proposed
amendment to section 47 has been adopted by some states
and provides as follows:

> The validity of the negotiation of a receipt is not
> impaired by the fact that such negotiation was a breach

of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was deprived of the possession of the same by loss, theft, fraud, accident, mistake, duress, or conversion, if the person to whom the receipt was negotiated, or the person to whom the receipt was subsequently negotiated, paid value therefor, in good faith, without notice of the breach of duty, or loss, theft, fraud, accident, mistake, duress or conversion. As amended August, 1922.

Mississippi has not adopted the proposed amendment of section 47.

 Under the Mississippi statutes it follows that a trespasser, a finder or a thief is not included within the description of those persons who may negotiate a receipt so as to give title to the receipt or other goods represented by it to a subsequent bona fide purchaser for value. It is obvious, therefore, that the appellee received no title to the receipts in question or to the cotton represented by them, though the appellee acted in good faith and in the course of business.

Under Mississippi Code Annotated sections 5051 and 5058 (1956), the appellee did not have a cause of action against the warehouseman and we do not have to decide what the rights of the litigants would be if the legislature of Mississippi had adopted the proposed amendments to sections 40 and 47 of the Uniform Warehouse Receipts Act.

No authority was cited by appellant or appellee, and apparently there is none in Mississippi which would authorize the appellee, as title holder or having interest in the receipts and the cotton represented thereby, to compel the warehouses to pay appellee the value of the cotton. The undisputed proof clearly shows that the cotton was delivered by the warehouses to the rightful owners.

The point which is in issue is determined conclusively by sections 5051 and 5058, together with the following cases: Commercial Nat'l Bank v. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 Sup. Ct. 194, 60 L. Ed. 417 (1916); Lundy v. Greenville Bank & Trust Co., 179 Miss. 282, 174 So. 802 (1937); Weil Bros., Inc. v. Keenan, 180 Miss. 697, 178 So. 90 (1938); Lineburger Bros. v. Hodge, 212 Miss. 204, 54 So. 2d 268 (1951).

It follows that it would be a futile act to require the appellee to institute suit for the recovery of cotton which it is impossible for him to obtain. It is pointed out in 42 C. J. S. *Indemnity* §16, as follows:

Where a proceeding to establish the loss of the indemnitee is rendered impossible or impracticable or facts appear showing that such proceedings would be futile, and the loss can be otherwise established, an action is unnecessary to establish the loss unless the parties have by precise language stipulated therefor. (42 C. J. S. at 593.)

██ █ Having acquired no title under the Mississippi statutes and decisions to the stolen receipts or to the cotton represented by them, the appellee would have no standing in any court to require the warehouses to pay it the value of the cotton in which it never had any title or interest.

The case at bar is clearly distinguishable from the well-known case of Lundy v. Greenville Bank & Trust Company, 179 Miss. 282, 174 So. 802 (1937). This Court in that case, speaking through Justice Cook, construed the identical warehouse receipts act now in effect in Mississippi. In that case a cotton factor had pledged and sold cotton warehouse receipts which were in fact owned by Lundy. Lundy contended that the factor had acquired the receipts by theft or trespass and that therefore he was entitled to the receipts and the cotton represented thereby as against the banks and persons to whom the factor had pledged and sold the receipts. These latter

persons contended that Lundy had entrusted the receipts
to the factor and that the negotiation of the receipts
to them was a mere breach of trust on the part of the
factor, and that therefore they were entitled to the re-
ceipts as against the owner, Lundy.

After going into the facts in detail, this Court con-
cluded and stated in its opinion that Lundy had entrusted
the receipts to the factor. This Court examined the
facts in detail in order to note the difference between
receipts which had been entrusted to the factor and
receipts which had been acquired by him through tres-
pass or theft. Section 5058, which was construed by the
Court, permits passage of title where the receipts are
obtained through fraud, mistake or duress to entrust
the possession or custody of the receipt to a factor or
some other person. It does not permit title to pass when
the factor or such other person trespasses, finds or
steals the warehouse receipt. We pointed out in that
case:

> From an analysis of the above-quoted sections, it will
> be noted that negotiable warehouse receipts, payable
> to bearer, may be negotiated by mere delivery, by
> any person to whom the custody of such a receipt
> *has been intrusted by the owner,* if at the time of such
> intrusting the receipt is in such form as it may be
> negotiated by delivery; and that a person to whom
> such a receipt is negotiated acquires under it such
> title to the goods as the person negotiating the re-
> ceipt to him and the depositor of goods or the person
> to whose order they were to be delivered by the terms
> of the receipt had or had ability to convey to a pur-
> chaser in good faith for value. (179 Miss. at 314, 174
> So. at 811.) (Emphasis ours.)

Sections 5048, 5051, 5052, 5058, 5068 and 5069 were
likewise construed in Weil Bros., Inc. v. Keenan, 180
Miss. 697, 178 So. 90 (1938). In that case Keenan, the
grower of the cotton and the owner of the warehouse

receipts therefor, was induced by fraud by one Spencer to give the receipts to Spencer for a specific purpose. Instead of carrying out this purpose, Spencer sold the cotton and delivered the receipts to Weil Brothers and then disappeared with the money. This Court held that Weil Brothers was entitled to the receipts and cotton, and stated:

> In Commercial National Bank v. Canal-Louisiana Bank & Trust Co., 239 U. S. 520, 36 S. Ct. 194, 195, 60 L. Ed. 417, Chief Justice Hughes said: ''It is a familiar rule that one who has no title to chattels cannot transfer title unless he has the owner's authority or the owner is estopped.'' The Chief Justice further said: ''It will be observed that 'one who takes by trespass or a finder is not included within the description of those who may negotiate.' '' . . . .
>
> A prime purpose of the Uniform Warehouse Receipts Act is to make the standard receipts issued by warehousemen for chattels documents of title so that people who honestly purchase these documents for value will be protected by the terms of the act as purchasers in good faith. We are firmly convinced that Keenan delivered the possession and custody of his warehouse receipts to Spencer by virtue of the fraudulent and false statement that Spencer had negotiated a sale of Keenan's cotton to Gooch. *Spencer did not acquire that possession by stealing the receipts;* Keenan voluntarily delivered the warehouse receipts and the samples of the cotton to Spencer, and exercised his own judgment on the truth of the statement made to him by Spencer. . . . (180 Miss. at 709-10, 178 So. at 94.) (Emphasis added.)

In Lineburger Bros. v. Hodge, 212 Miss. 204, 54 So. 2d 268 (1951), in which case the appellants were the growers of cotton, one Carr at times would haul appellants' cotton for them from the gin to the compress and store it. On the occasion in question, however, Carr

took appellants' cotton from the gin without authority, placed it in the compress, obtained negotiable warehouse receipts therefor and sold the receipts and cotton to appellees. This Court, speaking through Justice Alexander, held that the cotton was not entrusted to Carr by its owners and that since the cotton was taken by theft the purchaser of the warehouse receipts did not, under our Uniform Warehouse Receipts Act, obtain any title to the receipts or the cotton. We said in that case:

We approach, then, the rights of the appellants, the planters and owners. As heretofore stated, they had given Carr no authority to take and haul away any of this cotton. Specific instructions, including the time and identity of cotton to be so hauled, were always given, and Carr knew this. It is immaterial whether the warehouse knew of this limitation upon Carr's authority. It is sufficient that this limitation was understood between Carr and appellants. Here there was no dispute, and it is without question that the taking by Carr, under all the circumstances, was larceny, and that the receipts were fraudulently obtained. . . .

We find that the cotton was not so entrusted to Carr, and since the cotton was in fact stolen and the receipts fraudulently obtained, the defense of apparent authority, although available to the warehouse, does not aid the claim of the purchasers of the receipts.

It was held in Unger v. Abbott, 92 Miss. 563, 46 So. 68, that the rule caveat emptor applies against the claim of an innocent purchaser of warehouse receipts who purchased them from the owner's servant who had been sent with cotton to a compress company with instructions to have it weighed and to bring the receipts back to the owner, but who, contrary to his authority and instructions, took the receipts in his own name and sold them. (212 Miss. at 219, 220, 54 So. 2d at 270.)

We further noted:

> Our statutes do not go so far as those of some other states in protecting a bona fide purchaser of negotiable receipts in cases where the receipts had been stolen. See 56 Am. Jur., Warehouses, Sec. 53. Since such receipts were not negotiable at common law, their negotiability is to be measured by our statutes.

> We hold, therefore, that neither the cotton nor the receipts had been entrusted to Carr by the owners and that the latter are not estopped to set up their claim to the cotton as against the several appellees who purchased the receipts.

> . . . .

> The assertion wants no support that the statutes referred to were designed to insure the negotiability of warehouse receipts and to facilitate commerce in the market places where cotton is brought and sold. The innocent purchaser of a negotiable receipt is guaranteed an assurance without which the traffic could not be conducted. Yet, such assurance must take into account the older principle that an owner of cotton may not be divested of title by a trespasser or a thief. In order to strike a just balance between these two concepts the statutes were enacted. The buyer must still beware lest he is buying receipts which have been fraudulently obtained or cotton which has been stolen. . . . (212 Miss. at 221-22, 54 So. 2d at 271.)

■■ ■ From the foregoing statutes and cases, it is apparent that a finder or thief cannot transmit any title to warehouse receipts or the goods evidenced by the receipts, and that the appellee in the case at bar did not and could not acquire any title to the warehouse receipts from Holmes, or to the cotton represented by these receipts. Therefore, the warehouses were under obligation to deliver the cotton to the rightful owners from whom the receipts were stolen. The warehouses did what the law of Mississippi required them to do, namely, delivered

the cotton to the rightful owners, and the fact that the warehouses did so does not vest in appellee any right of action against the warehouses, and the appellee could not have maintained a successful action against the warehouses for the value of the cotton in which appellee had no interest.

■■ ■ If this Court should find in accordance with appellant's contentions, we would have to hold that the warehouses are liable to appellee for the value of the cotton represented by the original warehouse receipts, and that the warehouseman could recover from the rightful owners on their bonds with the result that the appellee would derive title through a finder or thief, and the loss would fall on the rightful owner. The constitutional powers of the government of the State of Mississippi are divided into three distinct departments, and each of them must be confided to a separate magistracy. We cannot by interpretation write the proposed amendment to the Uniform Warehouse Receipts Act, which the legislature did not adopt, into our statutes.

For the foregoing reasons, we hold that the trial court was correct in sustaining the demurrer and in granting a peremptory instruction to the appellee, and the judgment of the circuit court is hereby affirmed.

Affirmed.

*Ethridge, C. J., and Rodgers, Jones and Smith, JJ.,* concur.